ATTORNEY FOR APPELLANT
Kimberly A. DeVane
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Steve Carter
Attorney General of Indiana

Joby Jerrells
Deputy Attorney General
Indianapolis, Indiana

# In the
# Indiana Supreme Court

### No. 49S02-0502-CR-56

JOHN GLOVER,

*Appellant (Plaintiff below),*

v.

STATE OF INDIANA,

*Appellee (Defendant below).*

Appeal from the Marion Superior Court, No. 49G04-0210-MR-246224
The Honorable Steven Rubick, Commissioner Presiding

On Petition To Transfer from the Indiana Court of Appeals, No. 49A02-0401-CR-4

**November 2, 2005**

**Boehm, Justice**.

In the course of Glover's trial for murder, the State called his wife to testify against him. In this interlocutory appeal, Glover challenges the denial of his motion to suppress her testimony. We hold that a court cannot require the wife to testify as to confidential communications between her and Glover, but the marital privilege does not bar her voluntary testimony.

**Factual and Procedural Background**

In November 1999 Kamaljeet Dhaliwal, a native of India, moved to the United States and married Andrew Abdul, a United States citizen. Dhaliwal and Abdul were divorced in December 2001. As a result of the divorce, Dhaliwal became an illegal immigrant and was to be deported within six months. At the time of her divorce Dhaliwal and John Glover worked together at a hospital. She described Glover as a "good friend" who "used to treat me as his daughter there." When she explained to Glover that she was about to be deported, he offered to help her by "getting married on papers." Dhaliwal and Glover were married on February 28, 2002 in Louisville, Kentucky, and Dhaliwal became known as Bobbie Glover. Dhaliwal testified that Glover never stayed at her home for more than an hour and that she lived in the Wildwood Village Apartments with roommates, while Glover resided with a girlfriend at another apartment in the same complex.

On September 17, 2002, Tammy Gibbs, another resident of Wildwood Village, was found strangled in her apartment. A neighbor told police that she had seen Gibbs at around 8:15 that morning standing in front of Gibbs's apartment building beside a red truck driven by Glover. In police interviews Glover initially denied having been at Wildwood Village the day of Gibbs's murder, but after he was asked to take a polygraph test, he admitted that he had gone to the apartment complex that day. He claimed he was there to see Bobbie Glover (Dhaliwal) and that he had not seen Gibbs.

Two weeks after Gibbs's death, Dhaliwal called Detective Jesse Beavers and arranged to meet with him at police headquarters. She arrived with her priest and told Beavers that on the day of the murder Glover had arrived at her apartment between 10:15 and 10:45 in the morning. She reported that Glover had told her that he had killed Gibbs and had demonstrated how he had put his hands around Gibbs's neck.

The State charged Glover with Gibbs's murder and listed Dhaliwal as a witness. Glover moved to suppress Dhaliwal's testimony pursuant to the marital privilege codified at Indiana Code section 34-46-3-1(4) (2004). After a hearing, the trial court denied the motion on the ground that Glover's marriage to Dhaliwal was a sham designed only to save Dhaliwal from deportation. The trial court reasoned that if the purpose of a marriage is only to defraud, it is in-

consistent with the legal protections afforded married couples and the privilege is lost. The trial court certified its ruling for interlocutory appeal. On appeal, the Court of Appeals reversed, reasoning that there is no "fraudulent" marriage exception to the privilege, and therefore Dhaliwal could not testify at Glover's trial to these confidential communications. Glover v. State, 816 N.E.2d 1197, 1201 (Ind. Ct. App. 2004). This Court granted transfer. Glover v. State, 831 N.E.2d 737 (Ind. 2005).

## I. Who Qualifies as a Spouse

At common law two rules restricted spousal testimony. First, a "testimonial" privilege allowed either spouse to prevent the other from testifying against him or her. 8 Wigmore, Evidence § 2227 (McNaughton rev. 1961). This privilege was not limited to confidential communications but was available only to spouses who were married at the time of trial. Shepherd v. State, 257 Ind. 229, 232, 277 N.E.2d 165, 167 (1971); 8 Wigmore, supra, § 2230. The testimonial privilege was justified on the ground that it prevented discord between spouses. Hawkins v. United States, 358 U.S. 74, 77 (1958); 8 Wigmore, supra, § 2228. In addition to preserving marital harmony, this testimonial privilege was viewed as avoiding what was thought to be the naturally repugnant spectacle of a wife compelled to testify against her husband. Hawkins, 358 U.S. at 77-79; 8 Wigmore, supra, § 2228. This spousal testimonial privilege is not recognized in Indiana law. State v. Roach, 669 N.E.2d 1009, 1010 (Ind. Ct. App. 1996).

A second common law rule disqualified husbands and wives from testifying on behalf of their spouses. 2 Wigmore, supra, § 600. This competency rule was the product of the early common law disqualification of parties from testifying in their own causes, and also the notion that husband and wife were one. 2 Wigmore, supra, § 601. The rationale for spousal incompetence was first advanced by Lord Coke in 1 E. Coke, The First of the Institutes of the Lawes of England 6b (London 1628). If one spouse could not testify in his or her own behalf, neither could the other component of the marital unity. Because of the unity of spouses, the wife shared her husband's disqualification as an interested party. 2 Wigmore, supra, §§ 575, 600. Indiana law preserved this concept in the Civil Code of 1881, but the courts have limited its application primarily to will disputes. See I.C. § 34-45-2-9; Taylor v. Taylor, 643 N.E.2d 893, 896 (Ind. 1994); Lee v. Schroeder, 529 N.E.2d 349, 353 (Ind. Ct. App. 1988), trans. denied. It also

3

showed up in a case turning on the dead man's statute issues, and in actions of a husband for an alleged seduction of his wife. Bechert v. Lehe, 161 Ind. App. 454, 457, 316 N.E.2d 394, 397 (1974) (dead man's statute issue); Judah v. Goldsmith, 90 Ind. App. 81, 83, 164 N.E. 496, 498 (1929) (seduction); Mainard v. Reider, 2 Ind. App. 115, 116, 28 N.E. 196, 197 (1891) (seduction).

In the 1800s a third doctrine arose, first in the statutory reforms found in the Common Law Procedure Act. This took the form of a marital privilege protecting communications between husband and wife, distinct from the earlier testimonial privilege. 8 Wigmore, supra, § 2333. As Wigmore cautioned: "The two privileges have little in common, either in policy or in rule. Their separation needs repeated emphasis if the possibility of confusion is to be avoided." Id. at § 2334. The marital communications privilege differs from the testimonial privilege in several respects. It is limited to confidential communications protecting only communications between individuals who have entered into a legally recognized marriage, and survives the termination of the marriage. Holt v. State, 481 N.E.2d 1324, 1326 (Ind. 1985); Beyerline v. State, 147 Ind. 125, 130, 45 N.E. 772, 774 (1897).

In the mid-nineteenth century, most United States jurisdictions abolished or restricted the testimonial privilege and the competency rule, but the marital communications privilege was generally preserved. 8 Wigmore, supra, § 2333. In Indiana the marital privilege has been in place since at least 1881 as a subsection of the statute addressing a number of privileges. It now appears at Indiana Code section 34-46-3-1(4), which reads:[1] "Except as otherwise provided by statute, the following persons shall not be required to testify regarding the following communications: . . . (4) Husband and wife, as to communications made to each other."

It is undisputed that Glover's marriage to Dhaliwal was valid under Kentucky law and at the time of the alleged communication had not been voided or annulled. The State argues that Glover's conversation with Dhaliwal nevertheless enjoyed no privilege because it had "no relation to their mutual trust and confidence as husband and wife." The State argues that the marriage was entered into in an attempt to defraud the federal government, and therefore Glover

---

[1] The statutory marital privilege in Indiana was originally framed in terms of competence to testify, but the courts uniformly treated it as a privilege. The history of this section and the statutory competency rule is explained in State v. Wilson, ___ N.E.2d ___ (Ind. 2005).

4

should not enjoy the protections of the marital privilege. Stated differently, the State asks this Court to expand the requirement of a legal marriage, as announced in Holt, to exclude communications between individuals who have entered into a "fraudulent" or "sham" marriage.

The State cites Lutwak v. United States, 344 U.S. 604 (1953) in support of its position. In Lutwak, a World War II veteran was convicted of conspiracy to defraud the United States after entering into marriage for the purpose of deceiving the immigration authorities. Much of the evidence of the conspiracy came from Lutwak's spouse, and Lutwak argued that his marital relationship prevented his wife from testifying as to confidential communications between them. The Court concluded that where the parties entered into a sham marriage to defraud the federal government, "[t]he light of reason and experience do not compel [the Court] to so interpret the common law as to disqualify" the ostensible spouse from testifying. Id. at 615.

The State also points to Archina v. People, 307 P.2d 1083, 1091-92 (Colo. 1957), where the Colorado Supreme Court held that the Colorado marital privilege did not apply because the marriage was performed for the purpose of enabling the defendant to gain admittance to the United States. The court pointed out that the defendant and his wife had been married in a civil ceremony but "there was to be a subsequent ceremony performed in accordance with the religious convictions of both and after such second ceremony and only then would they consider themselves husband and wife." Id. at 1092. The court concluded that the Colorado legislature did not intend to protect the relationship between the defendant and his wife in a "cold, inanimate, lifeless relationship which had its beginning and end in a preliminary civil contract." Id.

The Court of Appeals held that Lutwak, as a ruling on evidence in federal courts, was not binding under Indiana law, and that Indiana recognized no "fraudulent" marriage exception to the marital privilege. Glover, 816 N.E.2d at 1200. We agree. The reasons why individuals get married can be varied and complex. Dhaliwal testified that the marriage was never consummated and was purely to permit her to remain in the United States. Glover responds that assisting Dhaliwal with her immigration status was not his sole purpose for entering into the marriage. He claims that he was in love with her and when asked whether they consummated the marriage Glover hesitantly answered, "I'd say yes." His communication to her was presumably based on his expectation of confidentiality, and there is no basis to conclude the marriage was for purposes

5

of disqualifying Dhaliwal as a witness. "Indiana generally recognizes that privileges are statutory in nature and that it is within the power of the legislature to create them." Terre Haute Reg'l Hosp., Inc. v. Trueblood, 600 N.E.2d 1358, 1360 (Ind. 1992). If the General Assembly chooses to engraft a qualification onto the marital privilege based on the quality of the marriage it is of course free to do that. But we are reluctant to require courts to inquire into the quality of a marriage beyond examining whether the marriage was for purposes of disqualifying a witness. See United States v. Lilley, 581 F.2d 182, 189 (8th Cir. 1978) (refusing to condition the privilege "on a judicial determination that the marriage is a happy or successful one"); People v. Fields, 328 N.Y.S.2d 542, 544-545 (N.Y. App. Div. 1972); State v. Freeman, 276 S.E.2d 450, 455 n.2 (N.C. 1981).

We think it is important to note that Lutwak and Archina dealt with claims of spousal incompetence, not privileges. In both cases, the "wife" was willing to testify but her husband sought to preclude her. As explained below, we conclude that the Indiana privilege does not prevent a spouse from testifying if he or she chooses to do so. The Indiana privilege is therefore less of a bar to access to information, and the reasons for seeking to examine the quality of a marriage in this context are less persuasive. Because we conclude that the privilege is waivable by either spouse, the issue of the quality of a marriage will matter only in circumstances where one spouse is not willing to testify against the other. That seems likely to occur only where the two are co-conspirators, as in Lutwak, or there is some form of common bond between the two. In the case of co-conspirators, the self-incrimination privilege will ordinarily be available to both spouses. If a loyalty exists between the two, it suggests the marriage was indeed a genuine relationship. We therefore see little benefit, and some mischief, in inquiring into the quality of a marriage.

There are limits to the marital privilege, but none apply here. The State directs us to authority from other courts that have held the marital privilege inapplicable where the purpose of the marriage was to prevent the testimony of the witness spouse. Osborne v. State, 623 P.2d 784 (Alaska 1981); Wells v. Commonwealth, 562 S.W.2d 622 (Ky. 1978). We agree that such a marriage may amount to a fraud on the court. But we are not faced with a marriage designed to prevent access to testimony. The marriage in this case was entered into before the crime in question and for reasons other than to prevent Dhaliwal from testifying. Similarly, communications

6

in an effort to provide false testimony are not protected by the privilege because they are intended to cause communications to others.[2] But as a general proposition, we hold that a marriage valid under applicable law is sufficient to permit a witness to invoke the marital privilege.

## II. The Holder of the Marital Privilege

Wigmore took the view that the communicating spouse alone was the holder of the marital privilege. 8 Wigmore, supra, § 2340; Edward J. Imwinkelried, The New Wigmore: Evidentiary Privileges § 6.5.1, at 553-54 (2002) (citing Fraser v. United States, 145 F.2d 139 (6th Cir. 1944), cert. denied sub nom.; Fraser v. Barton, 324 U.S. 849 (1945); Century 21 Pinetree Properties, Inc. v. Carson, 469 S.E.2d 458, 460 (Ga. Ct. App. 1996); 25 Wright & Graham, Federal Practice and Procedure: Evidence § 5582, at 670 (1989)). Accord 1 John W. Strong, McCormick On Evidence § 83, at 335-36 (5th ed. 1999). Under this view, in the case of a unilateral statement of a husband to his wife, only the husband can assert or waive the disqualification. McCormick, supra, § 83, at 335-36. This view is grounded on the rationale that "encouraging communication" between spouses is the reason for the marital privilege. Imwinkelried, supra, § 6.5.1, at 554. This Court embraced that view over 100 years ago:

> Where the criminal, in seeking advice and consolation, lays open his heart to his wife, the law regards the sacredness of their relation, and will not permit her to make known what he has thus communicated, even as it will not ask him to disclose it himself. But if what is said or done by either has no relation to their mutual trust and confidence as husband and wife, then the reason for secrecy ceases.

Beyerline, 147 Ind. at 130, 45 N.E. at 774. We think both the statutory language and a more realistic view of the reasons for this privilege support the conclusion that either spouse may waive the privilege.

The marital privilege is a subsection within the "Privileges of Attorneys, Physicians, Clergymen, and Spouses" statute, codified at Indiana Code section 34-46-3-1. It provides:

---

[2] Russell v. State, 743 N.E.2d 269, 272 (Ind. 2001). Russell's former wife testified to statements he made to her admitting his participation in the assaults of which he was charged. Id. at 272. We held that allowing this testimony was error, but harmless. Id. However, we also held that Russell's former wife was permitted to testify as to the statements he made to her after his arrest in which he instructed her to lie to police about his prior statements and to provide police with false information because "the statements were not disclosures made within the confines of the marital relationship." Id.

> Except as otherwise provided by statute, the following persons shall not be required to testify regarding the following communications:
>
> (1) Attorneys, as to confidential communications made to them in the course of their professional business, and as to advice given in such cases.
>
> (2) Physicians, as to matters communicated to them by patient, in the course of their professional business, or advice given in such cases.
>
> (3) Clergymen, as to the following confessions, admissions, or confidential communications:
>
>     (A) Confessions or admissions made to a clergyman in the course of discipline enjoined by the clergyman's church.
>
>     (B) A confidential communication made to a clergyman in the clergyman's professional character as a spiritual adviser or counselor.
>
> (4) Husband and wife, as to communications made to each other.

We think the marital privilege is qualitatively different from the professional privileges. See Wright & Graham, supra, § 5577, at 607 (noting "the differing nature" of the "two professional" privileges; i.e. the attorney/client and physician/patient privileges). Each of those privileges is based on the professional counseling relationship between client, who is the holder of the privilege, and the counselor. The effectiveness of the professional services requires open and complete disclosure by the client. In each case the policy justifying the privilege is to encourage full and open disclosure of even very dangerous information. Lahr v. State, 731 N.E.2d 479, 482 (Ind. Ct. App. 2000) (The attorney/client "privilege is intended to encourage 'full and frank communication between attorneys and their clients' . . . [and allow] both the attorney and the client to give complete and confidential information."); Trueblood, 600 N.E.2d at 1360 (physician/patient privilege statute is intended to inspire full and complete disclosure of knowledge pertinent and necessary to a trustful and proper relationship).

An attorney, physician, or priest is in a position to elicit information by assuring the client, patient, or penitent of the confidential nature of the communications. The existence of the privilege thus facilitates open communications to these professionals. The notion that spouses are encouraged to communicate by reason of the privilege seems highly questionable. As Wigmore put it, "the occasional compulsory disclosure in court of even the most intimate marital communications would not in fact affect to any perceptible degree the extent to which spouses share confidences." 8 Wigmore, supra, § 2332. We share Wigmore's doubts that many spouses assure their mates of the court protection available for confidences in the course of pillow talk.

In contrast to the other privileges the marital privilege is grounded at least in significant part not on a policy of promoting disclosure but on concern for the health of the ongoing relationship between husband and wife and the policy of preventing further conflict between them by forcing one to testify against the other. A desire to promote disclosure between spouses may be a secondary consideration in support of the marital privilege, but that factor is less critical than the need of an attorney to counsel or a doctor to treat based on complete and accurate information. Moreover, the marital privilege is subject to certain well-established exceptions and is not an absolute bar to all confidential communications. See, e.g., Russell v. State, 743 N.E.2d 269, 272 (Ind. 2001). The privilege does not prevent a spouse from testifying when the offense was committed by one spouse against the other. Shepherd, 257 Ind. at 232-33, 277 N.E.2d at 167 (citing Doolittle v. State, 93 Ind. 272 (1884)). We have also held that a spouse's testimony concerning attempts to coerce the spouse is not within the marital privilege. Carlyle v. State, 428 N.E.2d 10, 12 (Ind. 1981).

In addition to the different policies and limitations applicable to the marital privilege, the statutory language also produces different results for the marital privilege than it does for the other privileges found in the same section. The marital privilege in Indiana provides that a court "shall not [require]" one spouse to testify against the other. I.C. § 34-46-3-1(4). As a matter of ordinary English, this permits a willing spouse to testify. Other privileges (attorney/client, physician/patient, priest/penitent) appear in the same section of the Indiana Code and the same linguistic point applies to them. But in the case of the attorney and the physician, each is bound by a formal obligation of the profession to keep the confidences of the client. Canfield v. Sandock, 563 N.E.2d 526, 529 n.2 (Ind. 1990) ("The Hippocratic Oath imposes on physicians a duty to maintain confidences acquired in their professional capacity . . . [and the] boards governing the various areas of medical specialty police and enforce medical ethics."); Ind. Professional Conduct Rule 1.6 (subject to some specified exceptions, attorneys must keep their client's information confident). Many clerics are similarly bound. See, e.g., Catechism of the Catholic Church, Ch. 2, Art. 4 (1997) (The Sacrament of Penance and Reconciliation prohibits a priest by ecclesiastical law from revealing the substance of confessions even when the refusal to disclose results in imprisonment for contempt). These obligations create a right in the client to demand confidentiality, and the court cannot "require" testimony. There is no corresponding set of ethical and disciplinary rules for the marital relationship.

Because privileges operate to deny access to relevant and often critical information, they are strictly construed. <u>Roach</u>, 669 N.E.2d at 1010. In light of all of the forgoing considerations, we conclude that the marital privilege is more limited than the privileges attaching to communications to attorneys, physicians, and clerics. The marital privilege prevents a court from requiring a spouse to testify as to confidential marital communications, but does not bar the spouse from testifying if the spouse chooses to do so.

## Conclusion

The trial court's denial of Glover's motion to suppress Dhaliwal's testimony is affirmed.

Shepard, C.J., and Dickson, Sullivan, and Rucker, JJ. concur.