**William S. DIXSON, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee.**

**No. 49A02–0604–CR–295.**

Court of Appeals of Indiana.

May 4, 2007.

---

**6.** Pavlinac requests an award of attorney fees in excess of $10,000.

Ruth Johnson, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, J.T. Whitehead, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

SULLIVAN, Judge.

Appellant, William S. Dixson, was convicted following a jury trial of Murder, a felony,[1] and Carrying a Handgun Without a License, a Class A misdemeanor.[2] Upon appeal, Dixson presents three issues for our review, which we restate as: (1) whether the trial court erred in admitting certain evidence; (2) whether his convictions are supported by sufficient evidence; and (3) whether the trial court erred in ordering Dixson's sentences to run consecutively to a sentence imposed by another court in another cause.

We affirm.

The facts most favorable to the convictions reveal that on April 23, 2004, Dixson and his friend John Lane went to the "FAC" apartment building on 2309 North Capitol Avenue in Indianapolis. The pair went first to the apartment of Lisa Lewis, knocked on the door, and asked if Marcus Gibbs was there. After being informed that Gibbs was not there, Dixson and Lane went to the apartment of Nico Patterson, who also lived at the FAC building. Dixson knocked on Patterson's door, and Patterson cracked the door open to see who was outside. Dixson and Lane asked Patterson if Gibbs was there, but when Patterson replied that he was not, Dixson forced his way into the apartment. Dixson saw Gibbs in the apartment and told him to come out into the hallway.

---

1. Ind.Code § 35–42–1–1 (Burns Code Ed. Supp.2006).

2. Ind.Code §§ 35–47–2–1 (Burns Code Ed. Repl.2004), 35–47–2–23(c) (Burns Code Ed. Repl.2004).

Dixson, Lane, and Gibbs left the area near Patterson's apartment and returned to the area in front of Ms. Lewis's apartment. Dixson asked Gibbs, "Where's my money at?" Tr. at 81, 120. Lane testified that he had thought that Dixson simply wanted to talk with Gibbs, but Dixson instead pulled out a gun and shot Gibbs. Gibbs ultimately died of a gunshot wound to the chest. After the shooting, both Dixson and Lane ran off in different directions.

Although Lane was the only eyewitness to the shooting who testified, both Patterson and Ms. Lewis heard the sound of the gunshot. Indeed, after Ms. Lewis heard the gunshot, she opened her door and saw Dixson run by her and saw Gibbs lying on the floor.

In June of 2004, Lane spoke with Detective Moore of the Indianapolis Police Department about Gibbs's murder. Although Lane initially denied any knowledge of the shooting, afraid of being a "snitch," he eventually told the police that Dixson had shot Gibbs. Lane asked for police protection before implicating Dixson. After speaking with Lane, Detective Moore obtained a warrant for Dixson's arrest. Lane told Dixson that he had been questioned by the police, but did not tell Dixson that he had implicated him in the shooting. In response, Dixson warned Lane to "keep [his] mouth shut," and threatened Lane's family if Lane were to do otherwise. Tr. at 95. Lane, apparently fearing for his safety, went to Florida to wait for Dixson to be arrested. In August of 2004, however, Lane returned to Indianapolis. After

Lane's return, Dixson asked him why he had spoken to the police.

In the meantime, the police were searching for Dixson, and were conducting surveillance of the 2300 block of Kenwood Avenue, near the FAC building. The police observed both Lane and Dixson among a group of six or seven men on the front porch of the home of the mother of Lane's baby. Approximately twelve police officers converged on the group of men, loudly ordering them to lie on the ground. All of the men complied, except for Dixson, who unsuccessfully attempted to flee by running toward the FAC building. The police took both Lane and Dixson into custody.

On July 13, 2004, the State had charged Dixson with one count of murder and one count of carrying a handgun without a license. Lane was initially charged with murder, unlawful possession of a firearm by a serious violent felon, and carrying a handgun without a license. Lane faced the possibility of ninety-three years in prison if convicted of these charges.[3] After again speaking with Dixson in jail, Lane originally refused to testify against Dixson despite being offered use immunity. Later, Lane entered into a plea agreement with the State whereby he pleaded guilty to one count of assisting a criminal, a Class C felony, in exchange for his testimony and protection, apparently from Dixson.

Dixson too spoke with the police, and his version of events essentially agreed with that given by Lane with one significant exception—he claimed that Lane, not he,

---

**3.** Murder is punishable by up to sixty-five years incarceration. Ind.Code § 35–50–2–3 (Burns Code Ed. Supp.2006). Possession of a firearm by a serious violent felon is a Class B felony, which is punishable by up to twenty years incarceration. Ind.Code § 35–47–4–5 (Burns Code Ed. Supp.2006); Ind.Code § 35–50–2–5 (Burns Code Ed. Supp.2006). Carry-

ing a handgun without a license is at most a Class C felony, which is punishable by up to eight years incarceration. See I.C. § 35–47–2–23; Ind.Code § 35–50–2–6 (Burns Code Ed. Supp.2006). We do not assume, but neither do we decide, that there would have been a double jeopardy issue with regard to the two firearm charges.

had shot Gibbs. Dixson claimed that Lane was a drug dealer and explained that he had not reported his involvement with the murder because he feared a long prison sentence would keep him away from his wife.

A jury trial was held on February 27, February 28, and March 1, 2006. Prior to trial, Dixson sought to exclude portions of the statement he had given to the police in which he indicated that he might be involved in extra-marital affairs. Dixson also sought to exclude from evidence a taped telephone conversation he had with his wife while he was in jail. The trial court admitted this evidence over Dixson's objections. At the conclusion of the trial, the jury found Dixson guilty as charged. At a sentencing hearing held on March 9, 2006, the trial court sentenced Dixson to the maximum sentence of sixty-five years upon the murder conviction and to one year upon the misdemeanor conviction, to be served concurrently. The court also ordered the sentences in the instant crime to run consecutively to Dixson's eighteen-year sentence imposed in another cause. Dixson filed a notice of appeal on April 6, 2006.

### Evidentiary Rulings

■ Upon appeal, Dixson claims that the trial court improperly admitted into evidence both his statement to the police, in which he indicated that he had engaged in extramarital affairs, and a recorded telephone conversation he had with his wife while incarcerated at the Marion County Jail. Upon review of evidentiary rulings, the question of whether to admit evidence is within the sound discretion of the trial court. *Cox v. State*, 854 N.E.2d 1187, 1193 (Ind.Ct.App.2006). Our standard of review of rulings on the admissibility of evidence is effectively the same whether the challenge is made by a pre-trial motion to suppress or by a trial objec-tion: we consider the evidence and any uncontradicted evidence to the contrary in a light most favorable to the court's decision. *Id.*

■ The transcript of Dixson's statement to the police, which he does not claim is inaccurate, reads in relevant part as follows:

"Q And the night that this happened—on the 23rd of April—can you tell me where you were.

A Home.

Q Well, how are you gonna—?

A I don't even—I—that's what I'm sayin', I don't even remember but more than likely I would be home. I be home at night. I don't rip around the streets.

\* \* \*

A *And I said, when I come out at night, that means that I cheat at night which I ain't proud of but that's what I do.*

Q So on this night you can swear that you were at your house?

A You can call my wife. I don't really know where I was at on that—I can't—you can't say, 'Yeah, on that day yeah, I was at home,' More than likely, yeah, I was at home. Yeah, I was at home. 'Cause here lately my daughter been sick and I ain't even been leavin' her. And any time I leave, it ain't nothin' but like once or twice a week. It ain't no every night thing. I care more about my daughter's health than anything. We've been strugglin' lately (inaudible). It's just—I don't know. My wife pregnant already. And when the baby come out they gotta take a lung out. We already stressed out so of course I've been with my wife.

* * *

Q   I'm sittin' up here, bein' honest with you. I'm bein' honest with you through the whole flick—

Q   Listen, John—

A   —I ain't bullshittin' you or nothin', though

Q   —You said that you don't go out.

A   And I told you—

Q   —and you were out and—

A   —*and I told you on several occasions when I do happen to go out— that means I'm cheatin' or somethin' like that....*" State's Exhibit 49, pp. 91–93 (emphasis supplied).[4]

Dixson claims that the references in his statement to his infidelity were both irrelevant and improper evidence of his bad character and, therefore, should not have been admitted.

Indiana Evidence Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." As a general rule, relevant evidence is admissible, and irrelevant evidence is inadmissible. Ind. Evidence Rule 402. Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Ind. Evidence Rule 403. Furthermore, Indiana Evidence Rule 404(b) provides in relevant part that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."[5]

In the present case, the references to Dixson's infidelity might, in isolation, appear to be irrelevant. However, in the context of the issue of where Dixson was on the night of the murder for which he was charged, Dixson's statements that he never went out at night, unless it was to "cheat," do appear to be relevant as to that issue. Still, as noted, relevant evidence may nonetheless be inadmissible under Evidence Rules 403 or 404. Regardless, even if we were to presume that the trial court erred in admitting Dixson's statement, with its references to his infidelity, we would conclude that such evidence would be at most harmless error. The transcript of Dixson's statement to the police consists of forty-six pages, during which Dixson's infidelity is mentioned, briefly, twice. The trial court, in making its pre-trial ruling regarding this evidence, ordered that the State not argue that Dixson was "bad because he's a cheater." Tr. at 7. Dixson does not refer us to, and our review of the record does not reveal, that the State emphasized these references or otherwise argued that Dixson was a "bad person" because of his apparent infidelity.[6]

---

4.  The asterisks represent white space in the transcript of Dixson's statement, which apparently consisted of material redacted from the statement before its admission into evidence.

5.  The rule continues to state that such evidence may, however, be admissible for other purposes:

"such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pre-trial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial." Evid. R. 404(b).

6.  We further agree with the State that to the extent that this evidence would have tended to show any action by Dixson in conformity with his character as established by his "bad

Given the brief references to Dixson's infidelity, the fact that this evidence was not emphasized by the State, and the eyewitness testimony supporting Dixson's convictions, we cannot say that the trial court's decision to admit Dixson's statement to the police constituted reversible error. *See* Ind. Evidence Rule 103(a).

■ Dixson also argues that the trial court erred in admitting into evidence a conversation between him and his wife, Tonya, which was recorded while he was in jail. This conversation, a transcript of which was also admitted into evidence, reads:

"Tonya: I need to rewash your jersey. I think [our daughter] got chocolate on it.

Dixson: What?

Tonya: Yeah!

Dixson: What jersey?

Tonya: The Pacer one . . .

Dixson: Damn, what?

Tonya: Yeah.

Dixson: You'll have to clean that motherfucker.

Tonya: Yeah it was already spotted up . . . shit.

Dixson: Shit, burn that motherfucker.

Tonya: Huh?

Dixson: Really, you can burn that one.

Tonya: Shoot.

Dixson: Can you read between the lines?

Tonya: Burn it?

Dixson: Yeah.

Tonya: I don't know . . . no I can't read between the lines. What you mean?

Dixson: Burn it.

Tonya: Why, why you say can I read between the lines?

Dixson: I don't want that jersey no more.

Tonya: Well, I'm going to keep it.

Dixson: That jersey got me in trouble.

Tonya: Is that the, is this jersey the . . . ?

Dixson: Ehh nah nah nah nah . . . yes.

Tonya: Yeah I'm just gonna.

Dixson: Huh?

Tonya: Yeah, I'm just gonna, when Dominick come over.

Dixson: Yeah. Oxyclean probably can't even bring that back.

Tonya: Nope . . . That's the jersey you went to go see that bitch with isn't it

Dixson: What?

Tonya: That's the jersey you went to go see that bitch with wasn't it

Dixson: What bitch?

Tonya: That bitch

Dixson: What bitch?

Tonya: That bitch, you heard what I said

Dixson: I said what bitch?

Tonya: Can you read between the lines?

Dixson: No . . . you don't even know what I'm talking about

Tonya: I do too know what you talking about

Dixson: No you don't

Tonya: Yes I do, I'm not stupid. I know what you talking about. LL

Dixson: LL?

Tonya: Yeah.

Dixson: Oh." State's Exhibit 54 at pp. 153–55.

acts''—what Evidence Rule 404(b) prohibits—such action would be Dixson's propensity to stay at home unless he was out being unfaithful to his wife. At trial, this is certainly not what the State wished to establish; the State sought to establish that Dixson was neither at home on the night of the murder nor cheating on his wife but instead at the FAC building.

Dixson claims that the trial court erroneously admitted this evidence, arguing that it was irrelevant, improper evidence of his bad character, and violative of the privilege of spousal communications.[7]

With regard to the relevance of the conversation, we think that the trial court was within its discretion to conclude that this evidence was indeed relevant. In Dixson's second statement to the police, in which he admitted being at the scene of the crime but denied being the shooter, he stated that he had been wearing a blue Pacers jersey on the night of the murder. In the recorded conversation with his wife, Dixson instructs her to destroy a Pacers jersey which had been stained. The destruction of potentially incriminating evidence by Dixson is relevant. Moreover, given the probative value of this evidence, we do not agree with Dixson that the references to another woman unfairly prejudiced him.

Dixson's claim regarding "bad character" evidence is that this evidence again referenced his marital infidelity, as it "implied that he went to visit another woman." Appellant's Br. at 17. Initially, we are not entirely convinced that Dixson's conversation with his wife implied marital unfaithfulness, as his wife's crude reference to an unknown woman does not necessarily imply infidelity. Further, evidence which creates a mere inference of prior bad conduct does not fall within the purview of Evidence Rule 404(b). *See Allen v. State*, 743 N.E.2d 1222, 1232 (Ind.Ct. App.2001) (holding that testimony which might have created an inference that defendant had prior criminal history did not run afoul of Evidence Rule 404(b)), *trans. denied; Haak v. State*, 695 N.E.2d 944, 947 (Ind.1998) (holding that, even if witness's testimony that she was afraid of the defendant could have raised an inference of prior bad acts by defendant, such an inference did not violate Rule 404(b) because witness did not testify as to any conduct by the defendant).[8]

The brunt of Dixson's argument regarding this evidence is that the admission of a recorded conversation between him and his wife violates the "spousal privilege." As explained by our Supreme Court in *Glover v. State*, 836 N.E.2d 414 (Ind.2005), two common law rules restricted spousal testimony. The first rule, which is not recognized in Indiana, was the "testimonial privilege," which allowed either spouse to prevent the other from testifying against him or her. *Id.* at 416–17. The second rule disqualified one spouse from testifying on behalf of the other. *Id.* Indiana preserves this rule, but our courts have limited its application primarily to will disputes. *Id.* A third doctrine arose in the 1800s, taking the form of a marital privilege protecting communications between husband and wife, distinct from the earlier testimonial privilege. *Id.* This "marital communications privilege" differs from the testimonial privilege in several respects: it is limited to confidential communications protecting

---

7. Dixson briefly claims, without elaboration, that he was denied the presumption of innocence because the jury was told that the telephone call was recorded while he was in jail. Presuming that Dixson has made a cognizable argument on this matter, *see* Ind. Appellate Rule 46(A)(8)(a), he would not prevail. Dixson did not object upon these grounds at the trial court. A defendant may not argue one ground for an objection at trial and then raise new grounds upon appeal. *Bradley v. State*, 770 N.E.2d 382, 386 (Ind.Ct.App.2002), *trans. denied.*

8. Although Tonya connected the jersey with conduct of Dixson, i.e., a visit to "that bitch," such an act could have been for a legitimate purpose and did not assert infidelity. Therefore it was not an assertion of misconduct.

only communications between individuals who have entered into a legally recognized marriage and survives the termination of the marriage. *Id.*

By the mid-nineteenth century, most United States jurisdictions had abolished or restricted the testimonial privilege and the competency rule, but the marital communications privilege was generally preserved. *Id.* In Indiana this marital privilege is now codified at Indiana Code § 34–46–3–1 (Burns Code Ed. Repl.1998). This statute reads in relevant part, "Except as otherwise provided by statute, the following persons shall not be required to testify regarding the following communications: ... Husband and wife, as to communications made to each other." Based upon his arguments, it is apparent to us that by referring to a "spousal privilege," Dixson means the marital communications privilege codified in I.C. § 34–46–3–1.

■■■ The marital communications privilege is restricted to confidential communications and information gained by reason of the marital relationship, and not every communication between spouses is protected by virtue of the marital relationship. *Rubalcada v. State,* 731 N.E.2d 1015, 1022 (Ind.2000). Only those communications passing from one marriage partner to the other because of the confidence resulting from their intimate marriage relationship receive such protection. *Id.* Thus, the marital communications privilege is subject to certain well-established exceptions and is not an absolute bar to all communications. *Glover,* 836 N.E.2d at 421. Among these exceptions are where a spouse's testimony concerns disclosures by the other spouse not made in reliance upon the marital relationship but because the disclosing spouse was in need of his mate's assistance and attempted to coerce by force and fear, where the communication between spouses was intended to be transmitted to a third person, and where one spouse discloses a threat made by the other. *Russell v. State,* 743 N.E.2d 269, 272 (Ind.2001). Also, acts and communications made to a spouse in the presence of third parties are not protected by the privilege. *Kindred v. State,* 540 N.E.2d 1161, 1169 (Ind.1989);[9] *Perkins v. State,* 483 N.E.2d 1379, 1383 (Ind.1985). It is this last exception which dooms Dixson's claim that his conversation with his wife was protected by the privilege.

In the present case there was evidence, by means of a stipulation, that among other things, all telephone calls made by all inmates in custody of the Marion County Sheriff's Department are recorded, except those calls designated as calls with attorneys; that these calls are recorded in the interest of security, safety, and investigations; that all inmates are notified in the inmate handbook that the calls are recorded and/or monitored; that all inmates are notified that calls are recorded and/or monitored by means of an automated message played at the beginning of each call, which message states, "this call may be recorded or monitored"; that an automated message informs inmates every eight minutes during the call that the calls are recorded and/or monitored; that signs located above the telephones notify inmates that the calls are recorded; and that all calls are kept in the ordinary course of business. Tr. at 397–98.

**9.** The holding in *Kindred* regarding the amendment of charges was recently criticized by our Supreme Court in *Fajardo v. State,* 859 N.E.2d 1201 (Ind.2007). The *Fajardo* court listed *Kindred* among cases whose holdings regarding the amendment of charges were not in compliance with the relevant statute. *Fajardo,* 859 N.E.2d at 1206–07. The *Fajardo* court's criticism of *Kindred* did not refer to the *Kindred* court's treatment of the marital privilege.

Given this evidence, the trial court could clearly have concluded that Dixson's conversation with his wife was made in the presence of a third party, i.e., the Marion County Sheriff's Department and its agents, and was therefore not covered by the marital communications privilege. *See Kindred,* 540 N.E.2d at 1169 (defendant's statements made to wife in presence of third parties was not protected by marital privilege). Because the recorded conversation between Dixson and his wife was relevant, not unfairly prejudicial, not inadmissible "bad character" evidence, and not inadmissible pursuant to the marital communications privilege, the trial court did not err in admitting the conversation into evidence.[10]

### Sufficiency of the Evidence

Dixson claims that the evidence was insufficient to support his convictions. Upon review of such claims, we neither reweigh evidence nor judge witness credibility. *Proffit v. State,* 817 N.E.2d 675, 680 (Ind.Ct.App.2004), *trans. denied.* Instead, we consider only the evidence which supports the convictions and the reasonable inferences to be drawn therefrom to determine whether there is substantial evidence of probative value from which a reasonable trier of fact could have concluded that the defendant was guilty of the charged crimes beyond a reasonable doubt. *Id.*

Dixson's arguments in this regard ignore our standard of review, requesting that we consider evidence favorable to his argument, and reweigh the credibility of the State's most important witness, John Lane. We recognize that the State charged Lane with murder and that by entering into a plea agreement with the State, Lane avoided a potential sentence of ninety-three years. In fact, in exchange for his testimony, Lane received an eight-year sentence. Certainly this fact could have cast doubt upon Lane's credibility. But the issue of Lane's credibility was for the jury to determine. Based upon its verdict, the jury obviously credited Lane's testimony and ignored Dixson's argument that Lane was the shooter. The testimony of a single eyewitness to a crime may be sufficient to sustain a conviction for murder. *Green v. State,* 756 N.E.2d 496, 497 (Ind.2001). Moreover, although the testimony of an accomplice, such as Lane, is subject to high scrutiny, such testimony may by itself be sufficient to sustain a conviction. *Herron v. State,* 808 N.E.2d 172, 176 (Ind.Ct.App.2004), *trans. denied.* The fact that the accomplice may not be completely trustworthy goes to the weight and credibility of his testimony, which is entirely within the province of the jury and will not be reviewed upon appeal.[11] *Id.* Here, there was testimony that Dixson pulled out a gun and shot the victim in the chest and that the victim died of a gunshot wound to the chest. From this testimony, the jury could conclude that Dixson was guilty of both murder and carrying a handgun without a license.

### Sentencing

Dixson claims that the trial court erred in sentencing him. Dixson first

---

**10.** We therefore reject Dixson's brief argument that the "cumulative" effect of the evidentiary errors requires reversal.

**11.** Dixson does not explicitly mention the so-called "incredible dubiosity" rule. Under this rule, an appellate court may impinge upon the jury's responsibility to judge the credibility of the witness when it confronts inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of "incredible dubiosity." *Id.* Application of this rule is rare, as the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it. *Id.* Nothing about Lane's testimony is so improbable that it could not be believed by a reasonable trier of fact.

claims that his sentence is improper because he received a sixty-five-year sentence upon the murder conviction, whereas Lane, who Dixson claims is at least equally guilty as an accomplice, received only an eight-year sentence. This overlooks the fact that Lane was not convicted of murder, but of assisting a criminal, a Class C felony, and that Lane did receive the maximum sentence for his conviction. Other than this, Dixson does not make any specific claim that the trial court erred in considering the aggravating and/or mitigating circumstances. Instead, he focuses upon his argument that the trial court erred in imposing the maximum sentence and ordering this sentence to run consecutively to Dixson's eighteen-year sentence imposed in another cause.

Dixson claims that if the trial court wished to impose consecutive sentences, then it was required to impose the advisory sentence of fifty-five years. Dixson bases his claim upon his interpretation of the advisory sentence statute, Indiana Code § 35–50–2–1.3 (Burns Code Ed. Supp.2006), which he claims requires the trial court, when it imposes consecutive sentences, not to deviate from the advisory sentence. The advisory sentence statute reads as follows:

> "(a) For purposes of sections 3 through 7 [12] of this chapter, 'advisory sentence' means a guideline sentence that the court may voluntarily consider as the

midpoint between the maximum sentence and the minimum sentence.

> (b) Except as provided in subsection (c), a court is not required to use an advisory sentence.
>
> (c) *In imposing:*
>
> > (1) *consecutive sentences in accordance with IC 35–50–1–2;*
> >
> > (2) an additional fixed term to an habitual offender under section 8 of this chapter; or
> >
> > (3) an additional fixed term to a repeat sexual offender under section 14 of this chapter;
>
> *a court is required to use the appropriate advisory sentence in imposing a consecutive sentence or an additional fixed term.* However, the court is not required to use the advisory sentence in imposing the sentence for the underlying offense." I.C. § 35–50–2–1.3 (emphasis supplied).

The consecutive sentence statute, Indiana Code § 35–50–1–2 (Burns Code Ed. Supp. 2006), referenced by I.C. § 35–50–2–1.3, reads in relevant part:

> "(c) Except as provided in subsection (d) [13] or (e),[14] the court shall determine whether terms of imprisonment shall be served concurrently or consecutively. The court may consider the:
>
> > (1) aggravating circumstances in IC 35–38–1–7.1(a); and

**12.** Sections 3 through 7 concern Murder, Class A felonies, Class B felonies, Class C felonies, and Class D felonies respectively.

**13.** Subsection (d) of I.C. § 35–50–1–2 requires the court to order sentences to be served consecutively, regardless of the order in which the crimes are tried and sentences are imposed, if after being arrested for one crime, the defendant commits another crime before the date the person is discharged from probation, parole, or a term of imprisonment imposed for the first crime, or while the de-

fendant is released upon his own recognizance or on bond.

**14.** Subsection (e) of I.C. § 35–50–1–2 states that if the fact-finder determines that the defendant used a firearm in the commission of the offense for which he was convicted, the court must order the sentences for the "underlying offense" and the additional term of imprisonment imposed under I.C. § 35–50–2–11 to be served consecutively.

(2) mitigating circumstances in IC 35–38–1–7.1(b); in making a determination under this subsection. The court may order terms of imprisonment to be served consecutively even if the sentences are not imposed at the same time. *However, except for crimes of violence,*[15] *the total of the consecutive terms of imprisonment,* exclusive of terms of imprisonment under IC 35–50–2–8 [governing habitual offenders] and IC 35–50–2–10 [governing habitual substance offenders], *to which the defendant is sentenced for felony convictions arising out of an episode of criminal conduct*[16] *shall not exceed the advisory sentence for a felony which is one (1) class of felony higher than the most serious of the felonies for which the person has been convicted.*" (emphasis supplied).

Dixson recognizes that the crimes for which he was convicted occurred prior to the passage of I.C. § 35–50–2–1.3, which was part of the General Assembly's April 25, 2005 amendments to our sentencing scheme in response to *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). He claims that the "ameliorative nature" of this statute nevertheless requires that it be applicable to his case.

In support of his argument, Dixson relies solely upon the decision by another panel of this court in *Robertson v. State,* 860 N.E.2d 621 (Ind.Ct.App.2007). In

*Robertson,* the trial court ordered the defendant to serve an enhanced two-year sentence for Class D felony theft consecutive to the defendant's sentence in another cause in another county. Upon appeal, the *Robertson* court concluded that I.C. § 35–50–2–1.3 prohibited trial courts from deviating from the advisory sentence for any sentence ordered to run consecutively. *Id.* at 624–25. However, on April 17, 2007, our Supreme Court granted transfer in *Robertson,* thereby vacating that opinion.

We further observe that the *Robertson* court specifically rejected the interpretation of I.C. § 35–50–2–1.3 found in the earlier opinion in *White v. State,* 849 N.E.2d 735 (Ind.Ct.App.2006), *trans. denied.* In *White,* the defendant was convicted of murder and attempted murder in the same cause, and the trial court sentenced him to the maximum terms of sixty-five and fifty years, respectively. The trial court also ordered the sentences to run consecutively, for an aggregate sentence of 115 years. Upon appeal, the defendant argued that I.C. § 35–50–2–1.3 required the court, in imposing consecutive sentences under I.C. § 35–50–1–2, to use the advisory sentences for both of his convictions. The *White* court rejected the defendant's claim, concluding that I.C. § 35–50–2–1.3 imposed no additional restrictions upon the ability of a trial court to impose consecutive sentences. 849 N.E.2d at 743.

More recently, in *Barber v. State,* 863 N.E.2d 1199 (Ind.Ct.App.2007), another panel of this court agreed with the *White* court's interpretation of I.C. § 35–50–2–

---

**15.** Subsection (a) of I.C. § 35–50–1–2 defines a "crime of violence" as meaning: murder, attempted murder, voluntary manslaughter, involuntary manslaughter, reckless homicide, aggravated battery, kidnapping, rape, criminal deviate conduct, child molesting, sexual misconduct with a minor as a Class A or Class B felony, robbery as a Class A or Class B felony, burglary as a Class A or Class B felo-

ny, and causing death when operating a motor vehicle.

**16.** Subsection (b) of I.C. § 35–50–1–2 defines an "episode of criminal conduct" as meaning "offenses or a connected series of offenses that are closely related in time, place, and circumstance."

1.3, but added further explanation. The *Barber* court noted that I.C. § 35–50–2–1.3 was part of the post-*Blakely* sentencing amendments intended to rectify the Sixth Amendment infirmities in Indiana's sentencing scheme as identified in *Smylie v. State*, 823 N.E.2d 679 (Ind.2005), *cert. denied*, ⎯ U.S. ⎯, 126 S.Ct. 545, 163 L.Ed.2d 459. *See Barber*, 863 N.E.2d at 1211. Under the post-*Blakely* "advisory sentence" scheme, a trial court may, but is not required to, impose the advisory sentence, which in terms of length is identical to the prior presumptive sentence. *See Barber*, 863 N.E.2d at 1211. According to the *Barber* court, I.C. § 35–50–2–1.3 explains that an advisory sentence "is in most cases exactly that—advisory...." *Id.*

Under the pre-*Blakely* scheme, the presumptive sentence was also used in I.C. § 35–50–1–2 to calculate the "cap" on the aggregate length of consecutive sentences involving non-violent single episodes of criminal conduct. When replacing the term "presumptive" with the otherwise non-binding "advisory" sentence, the General Assembly, in I.C. § 35–50–2–1.3(c) reminded trial courts of those statutory provisions that do require the "use" of an advisory sentence (by using the advisory sentence to determine the relevant range or cap on aggregate sentences): "(1) in imposing consecutive sentences in accordance with Indiana Code § 35–50–1–2; (2) in imposing an additional fixed term to an habitual offender under Indiana Code § 35–50–2–8; and (3) in imposing an additional fixed term to a repeat sexual offender under Indiana Code § 35–50–2–14." *Barber*, 863 N.E.2d at 1211.

We agree with the *Barber* court that trial courts are required to "use" advisory sentences only in those situations where another statute requires use of the advisory sentence, specifically, with respect to I.C. § 35–50–1–2, in determining the relevant cap on the total length of consecutive sentences for non-violent episodes of criminal conduct. *See id.* Following the holdings in *White* and *Barber*, we reject Dixson's argument that the trial court was required to impose the advisory sentence when it also ordered his sentences to run consecutively to the previously-imposed sentence in the separate cause.[17] *See also*

---

**17.** We further acknowledge, as did the court in *Barber*, that under the *Robertson* court's interpretation of I.C. § 35–50–2–1.3, a host of problems could arise. The trial court in *Robertson* ordered the defendant's sentence to be served consecutively to a sentence in another cause. The *Robertson* court noted that the trial court in the other cause was not restricted from deviating from the advisory sentence in the earlier-imposed sentence because the last part of I.C. § 35–50–2–1.3(c) states that the court "is *not* required to use the advisory sentence in imposing the sentence for the *underlying offense.*" (emphasis supplied). This provision might seem unproblematic in cases such as *Robertson* (or the case before us) in which the trial court has ordered the sentence imposed to be served consecutively to an already-imposed sentence in another cause. In such cases, the earlier-imposed sentence could be considered the "underlying offense." However, things are less clear under circumstances similar to those which were present in both *White* and *Barber*, in which the defendants were convicted of multiple crimes and in which the trial courts ordered those simultaneously-imposed sentences to be served consecutively. As noted in *Barber*:

"Which of Barber's two reckless homicide convictions is the 'underlying offense'? The problem becomes more evident when applied to the facts in *White*. White was convicted of murder and attempted murder in the same cause. Under *Robertson*, how would the trial court have decided which offense was the 'underlying offense'?" *Barber*, 863 N.E.2d at 1212.

We can imagine similar questions involving defendants sentenced to consecutive sentences in the same cause which sentences are also ordered to run consecutively to sentences in one or more previous convictions. We need not delve into the various permutations which could arise in such hypothetical situa-

*Luhrsen v. State*, No. 15A01–0605–CR–198, 2007 WL 1166056 (Ind.Ct.App. April 20, 2007) (following *White* and rejecting *Robertson*).

### Conclusion

The eyewitness testimony was sufficient to support Dixson's convictions, and the trial court did not commit reversible error in admitting into evidence Dixson's statement to the police and his recorded telephone conversation with his wife. Moreover, the trial court did not err in ordering

Dixson's enhanced sentences to be served consecutively.

The judgment of the trial court is affirmed.

ROBB, J., and BARNES, J., concur.

---

tions. We simply note that the interpretation of I.C. § 35–50–2–1.3 found in *White* and *Barber*, which we follow today, avoids these issues.

Further, under the *Robertson* court's interpretation, even violent felons would receive the benefit of I.C. § 35–50–2–1.3's supposed restrictions upon consecutive sentences—a benefit I.C. § 35–50–1–2 itself specifically denies to violent felons. *See* Joel M. Schumm,

*Interpreting the Law: Decisions Reflect Different Approaches*, Res Gestae, April 2007 at 38–39 (discussing the conflict between the *White* and *Robertson* holdings and noting that that post-*Blakely* amendments to the sentencing statutes were meant to rectify *Blakely* concerns, not "limit the longstanding ability of trial courts to impose enhanced and consecutive sentences in most circumstances.").