## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
May 15 2015, 8:35 am
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Stephen P. Murphy, Jr.
Law Offices of Stephen Murphy, LLC
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Gregory Zoeller
Attorney General of Indiana

Christina D. Pace
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Scott Wolf,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

May 15, 2015

Court of Appeals Case No.
82A01-1410-CR-433

Appeal from the Vanderburgh
Superior Court
The Honorable Robert J. Pigman,
Judge
Cause No. 82D02-1306-FA-810

**Bradford, Judge.**

# Case Summary

[1] On May 1, 2013, Appellant-Defendant Scott Wolf was manufacturing methamphetamine in his cousin's apartment. During the manufacturing

process, a bottle containing highly flammable contents began to leak and started a fire in the apartment. After an investigation into the origins of the fire and upon finding that Wolf had purchased large amounts of pseudoephedrine (a common methamphetamine precursor) in the weeks prior to the fire, Appellee-Plaintiff the State of Indiana ("the State") charged Wolf with dealing in methamphetamine. Wolf was found guilty and sentenced to forty years of incarceration. On appeal, Wolf argues that the evidence was insufficient to support his conviction. We disagree and affirm Wolf's conviction.

# Facts and Procedural History

[2] On May 1, 2013, Wolf began the process of making methamphetamine at his cousin Shane Memmer's apartment. Wolf had been staying at Memmer's apartment which was located in the North Apartment Complex in Evansville and lies within 1000 feet of Holy Redeemer School. Wolf and Memmer had an agreement whereby Wolf was allowed to manufacture methamphetamine in Memmer's apartment and in return, Wolf would give Memmer a portion of the product. Prior to May 1, this arrangement had continued for approximately "eight to ten weeks" and Wolf had produced "six or eight" batches of methamphetamine. Tr. p. 301.

[3] After Memmer dropped his son off for school on the morning of May 1, he returned home and began helping Wolf with his methamphetamine production. As part of this process, Wolf had filled empty plastic bottles with several ingredients and explained to Memmer that he had to shake the bottle and then

slowly release the pressure and fumes. After the two had been shaking the bottles for approximately forty-five minutes, Wolf's bottle sprung a leak. As the liquid sprayed from the bottle it caught flame and started a fire in the kitchen. Wolf and Memmer attempted to extinguish the fire to no avail. At Memmer's instruction, Wolf attempted to retrieve a fire extinguisher from the Laundromat next door but fell and broke his arm in the process. A short time later, the fire department arrived at Memmer's apartment. Upon hearing sirens, Memmer fled the scene but was picked up by police officers soon after.

[4] After putting out the fire, Evansville Fire Department investigator Joseph Mayer spoke with Wolf and examined the Memmer's apartment. Based on the presence of several items known to be used in the production of methamphetamine (including three containers of lye, stripped lithium batteries, coffee grinder and filters, a can of xylene organic solvent, and Coleman camping fuel), Mayer requested the presence of the Drug Enforcement Unit.

[5] Evansville Police Department Detective Patrick McDonald, who works with the Methamphetamine Suppression Unit, was called to the scene. In addition to the items found by Mayer, Detective McDonald found several additional tools and precursors used in the production of methamphetamine, including wire cutters, safety goggles burned to a container of lye, a one-pint container of liquid fire (a sulfuric-acid-based drain cleaner), an air-purifying mask, a burned backpack containing mail addressed to Wolf, instant cold packs containing ammonia nitrate, an empty box of Claritin-D pseudoephedrine, as well as

several items of "lab trash." Tr. p. 308. The items found were consistent with methamphetamine being manufactured by the "one pot" method. Tr. p. 32.

[6] Memmer testified that both he and Wolf had bought the precursors necessary to produce methamphetamine on several occasions, mainly from local CVS and Walgreens drug stores. Memmer testified that he never purchased pseudoephedrine for himself or Wolf for any purpose other than the manufacture of methamphetamine. Wolf's National Precursor Log Exchange[1] ("NPLEx") records indicate that he bought the following boxes of pseudoephedrine based medications: one 1.44-gram box on April 26, 2013, one 2.4-gram box on April 24, 2013, one 2.4-gram box on April 21, 2013, one 0.72-gram box on April 20, 2013, one 2.4-gram box on March 25, 2013, on 2.4-gram box on March 20, 2013, one 2.4-gram box on March 18, 2013, one 3.6-gram box on March 8, 2013, and one 2.4-gram box on February 18, 2013. Wolf was also prohibited from purchasing pseudoephedrine medications on March 27 and April 8, 2013, for exceeding the maximum amount allowed to be purchased in a given period of time.

[7] The State charged Wolf with Class A felony dealing in methamphetamine within 1000 feet of a school, Class A felony dealing in methamphetamine within 1000 feet of a family housing complex, Class A felony conspiracy to commit dealing in methamphetamine within 1000 feet of a school, and Class A

---

[1] The NPLEx is a system which documents individual's purchases and attempted purchases of ephedrine and pseudoephedrine.

felony conspiracy to commit dealing in methamphetamine within 1000 feet of a family housing complex. A jury found Wolf guilty as charged. On September 8, 2014, the trial court merged the conspiracy and dealing convictions and sentenced Wolf to forty-year terms for each dealing in methamphetamine conviction to be served concurrently.

# Discussion and Decision

[8] Wolf argues that there was insufficient evidence to support his convictions for dealing in methamphetamine.

> When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences *supporting* the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder *could* find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007) (internal quotations and citations omitted, emphases in original).

[9] In order to convict Wolf of Class A felony dealing in methamphetamine the State was required to show that Wolf knowingly or intentionally manufactured methamphetamine, pure or adulterated, within 1000 feet of a school property or housing complex. Ind. Code § 35-48-4-1.1. Wolf concedes that he was staying

at Memmer's apartment at the time of the fire and that methamphetamine was being produced at Memmer's apartment; as such we need not reiterate the evidence thereof. However, Wolf argues that there was not sufficient evidence that he took part or aided in the manufacturing process and that it was only Memmer who had been illegally producing the drug.

[10] The probative evidence and reasonable inferences supporting the verdict include Memmer's testimony which revealed that (1) he and Wolf had an agreement whereby he would allow Wolf to produce methamphetamine in his apartment and (2) that the fire started in his apartment during and as a result of Wolf's manufacture of methamphetamine. Additionally, Wolf's NPLEx records indicate that Wolf had purchased large amounts of the methamphetamine precursor pseudoephedrine in the weeks prior to the fire. In fact, Wolf had reached the legal limit of pseudoephedrine allowed to be purchased by an individual and had twice been prohibited from purchasing additional amounts on March 27 and April 8, 2013, just weeks before the fire. Wolf's pseudoephedrine purchase history corroborates Memmer's testimony that Wolf had been producing methamphetamine at his apartment for approximately eight to ten weeks prior to the fire. Wolf made nine separate pseudoephedrine purchases in the months prior to the fire, the first of which was made on February 18, 2013, ten weeks before the fire.

[11] Furthermore, when Wolf was being treated at the hospital following the fire, he gave a statement to Detective McDonald which was later contradicted in several respects. Wolf told McDonald that he arrived at Memmer's apartment

on the morning of May 1, 2013, that Memmer was not at the apartment, and that Wolf took Memmer's son T.M. to school. However, T.M. testified that Wolf stayed at the apartment the night before, that Memmer was home, that Memmer took T.M. to school, and that Wolf had never taken T.M. to school. Wolf also told Detective McDonald that although he and Memmer never called 911 to report the fire, he did tell the attendant at the Laundromat to call 911. This statement was contradicted by the Laundromat attendant who testified that Wolf did not tell her to call 911 and that he only told her that there had been "a grease fire and he was asleep and that he was home alone." Tr. p. 238. Clearly, Wolf was not home alone based on his own statements that he and Memmer attempted to extinguish the fire.

[12]     Wolf argues that the evidence is insufficient for several reasons: (1) Memmer's testimony contradicted his initial statements to police; (2) Wolf's NPLEx report does not show that he purchased any Claritin-D, which was the only pseudoephedrine medication present at the apartment; and (3) Wolf's fingerprints were not found at the scene. Regardless of the fact that the State addressed these contentions at trial, Wolf's arguments amount to no more than a request for this court to reweigh the evidence and reassess the Memmer's credibility as a witness, which we will not do. *Drane*, 867 N.E.2d at 146. The jury heard Wolf's arguments regarding a lack of fingerprint evidence and the alleged inconsistencies with Memmer's statements. The jury, apparently, did not find those arguments persuasive. "The fact that an accomplice may not be completely trustworthy goes to the weight and credibility of his testimony,

which is entirely within the province of the jury and will not be reviewed upon appeal." *Gregory v. State*, 885 N.E.2d 697, 705-06 (Ind. Ct. App. 2008) (citing *Dixson v. State*, 865 N.E.2d 704, 714 (Ind. Ct. App. 2007), *trans. denied*). In *Gregory v. State*, we held that testimony from Gregory's co-defendant that the two had agreed to manufacture methamphetamine, combined with evidence that Gregory had purchased items commonly used to manufacture methamphetamine, was sufficient to support a conviction for dealing in methamphetamine. *Id*.

[13] Again, this court considers only the probative evidence and reasonable inferences *supporting* the verdict. *Drane*, 867 N.E.2d at 146. That evidence includes witness testimony incriminating Wolf, Wolf's NPLEx records, Wolf's presence at the apartment during the fire, the presence of items belonging to Wolf at the apartment, and Wolf's own contradicted statements to Detective McDonald and witnesses. Based on the facts supporting an inference of guilt, the jury's decision was not unreasonable.

[14] The judgment of the trial court is affirmed.

Vaidik, C.J., and Kirsch, J., concur.