

FILED

Jul 17 2020, 8:35 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Bruce W. Graham
Graham Law Firm P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jesse R. Drum
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Patrick M. Elliott,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

July 17, 2020

Court of Appeals Case No.
19A-CR-2498

Appeal from the Tippecanoe
Superior Court

The Honorable Randy J. Williams,
Judge

Trial Court Cause No.
79D01-1708-MR-3

**Sharpnack, Senior Judge.**

# Statement of the Case

Following a jury trial, Patrick Elliott was convicted of murder, a felony,[1] and false informing as a Class A misdemeanor.[2] He then admitted to the sentencing enhancement of using a firearm to commit the murder.[3] The trial court sentenced Elliott to an aggregate term of seventy-five years executed in the Indiana Department of Correction. He appeals his conviction and sentence. We affirm.

# Issues

Elliott presents two issues for our review, which we restate as:

1. Whether the trial court erred in admitting the testimony of Elliott's pastor in contravention of the clergymen privilege; and

2. Whether his sentence is inappropriate in light of the nature of the offenses and the character of the offender.

# Facts and Procedural History

In 1999, Elliott married Donita who brought two children to the marriage. Three years later, Donita was diagnosed with bipolar disorder and generalized

---

[1] Ind. Code § 35-42-1-1(1) (2017).

[2] Ind. Code § 35-44.1-2-3(d)(1) (2016).

[3] Ind. Code § 35-50-2-11 (2016).

anxiety disorder and was prescribed medication for her mental health issues. During the course of their marriage, the couple experienced marital problems, which Elliott attributed to Donita's mental health issues and her "over the top or excessive" "reactions to normal day to day challenges[.]" Tr. Vol. 4, p. 97. In 2009, Elliott petitioned for legal separation; however, the couple reconciled. In 2015, the couple informally separated, and Donita moved out of the marital home. However, the couple again reconciled, and Donita returned to the home.

[4]  In the days leading up to the murder, which occurred in the early morning hours of August 8, 2017, Elliott and Donita exchanged text messages about their troubled relationship and Donita's mental health issues, and Elliott explored having Donita committed to a mental hospital. On August 3, Donita sent a text message to Elliott stating that she was not going to any appointments and that she wanted a divorce. Elliott replied: "You love me, I love you. . . . Your bipolar lashes out to cause me pain[.]" Ex., Def.'s Ex. A, p. 200. On August 4, Donita texted to Elliott: "F*** you, go take a bath and hold your head under[;]" and "F*** off, do you want me to take the gun to your head[?]" Id. at 201. That evening, Elliott contacted a mental health hotline and communicated with a crisis counselor regarding Donita's behavior.

[5]  On August 5, around 2:00 a.m., Donita texted Elliott, accusing him of placing her in a chokehold. In his responses, Elliott intimated that Donita had slipped and that he had not placed her in a chokehold but, instead, had prevented her from falling and hitting her head. Approximately thirty minutes later, Elliott

traveled to the Tippecanoe County Sheriff's Department (TCSD) and talked with Lieutenant Brian Lowe about the process for having his wife committed to a psychiatric or mental hospital. The lieutenant explained the process and then asked if Elliott needed a wellness check for Donita. Elliott declined.

[6] On the morning of August 7, Elliott opened a separate bank account in his name only and transferred $10,000 from an account that he shared with Donita to the new account. Elliott and Donita exchanged heated text messages throughout the day. Donita texted that she was moving out and needed the money.

[7] At approximately 4:30 p.m. on August 7, Elliott again traveled to the TCSD, this time speaking with Officer Steven Stonerock about having Donita committed. Officer Stonerock asked Elliott if he wanted an officer to perform a wellness check on his wife, but Elliott refused. However, approximately one hour later, Elliott called the TCSD and asked for a wellness check for Donita.

[8] When the sheriff's deputies arrived, Elliott met them in his driveway. The deputies spoke with Elliott first and then with Donita's adult daughter Ashley, who, at the time, was living in a pole barn that was located on the property. After speaking with Elliott and Ashley, the deputies entered the home to speak with Donita. The deputies noticed that the kitchen appeared to have been ransacked. When the deputies first encountered Donita, she was sitting in her living room, calmly watching television. However, when she found out that Elliott had asked the deputies to perform a wellness check, she became

increasingly angry that the officers were in her home and "attempting to get her to go to the hospital." Tr. Vol. 3, p. 207. Donita directed vulgar language at the deputies, and she called 911 several times in an effort to have the deputies removed from her home. Elliott called Donita's treating psychiatrist; however, the consensus of the deputies and the psychiatrist was that the requirements for the involuntary commitment of Donita had not been met.

[9] Donita left while the deputies were still at her house. Elliott then asked the deputies "something to the effect [of] what am I supposed to do wait until she attacks me?" *Id.* at 218. One of the deputies told Elliott that he could defend himself. The other deputy suggested to Elliott that, if Donita returned, he could record the encounter—"get some sort of evidence that we can sink our teeth into to substantiate one side or the other." *Id.* at 248.

[10] At some point after Donita and the deputies had left the house, Elliott retrieved a handgun from his car, brought it into the house, and hid it in the buffet next to his recliner. He called one of the deputies at 12:15 a.m., on August 8, to thank him for coming earlier. The deputy returned Elliott's call around 12:42 a.m., but the call went to voicemail.

[11] After leaving her home, Donita checked into a motel room and ordered dinner. Around midnight, she texted Elliott to tell him she needed to pick up her belongings from the house. Elliott was in the garage when Donita entered the back door of their house at 12:27 a.m. At 12:49 a.m., Elliott entered the house

through the back door and used his cell phone to record the following interaction with his wife:

> Elliott:  This would be a whole lot easier to understand if you could tell me when are you gonna get help.  When are you gonna get help?
>
> Donita:  What?
>
> Elliott:  When are you gonna get help?
>
> Donita:  I'm not.  I'm off meds.  I'm f***in' done.  You ruined it.
>
> Elliott:  And, you're fine?
>
> Donita:  I'm fine.
>
> Elliott:  You're fine.
>
> Donita:  I just threw four hundred f***in' dollars' worth of pills down the drain.
>
> Elliott:  And?
>
> Donita:  Leave me the f*** alone.  Go to the other room like we agreed.  You'd take the bedroom and I would take the couch. Get out.
>
> Elliott:  I think I want the couch.
>
> Donita:  No, I'm taking the couch.

Elliott: I'm gonna be up earlier, and . . .

Donita: I don't give a f***. Get out.

Elliott: [Your grandchild] won't be here.

Donita: No sh**. You f***in' ruined that too.

Elliott: I did that? I ruined [the grandchild]?

Donita: Get the f*** out.

Elliott: I'm gonna sleep in the living room.

Donita: No you're not.

Elliott: Like I have been.

Donita: No you're not.

[Loud thud, followed by a noise]

Elliott: What are you doing?

Donita: Get the f*** out.

[Loud thud]

Elliott: What are you doing?

Donita: It's my chair. Get the f*** out.

[Sound similar to an object being dropped]

Donita:  Shoot me.  I don't care, give . . .  I don't give a f***.
Shoot me.

[Gunshot, followed by loud thud]

Donita:  Please help.  Please help.

[Loud thud]

Elliott:  Nope.

Donita:  Please help.

Elliott:  Nope.

Donita:  Please help.

Elliott:  There's your f***in' knife.  F*** you.

[Banging sound]

Donita:  Please help.

Elliott:  No.

Donita:  Goddammit, my phone's in the truck.  Please help.

Elliott:  F*** you.

Donita:  I love you, Goddammit.

Elliott:  I will help when I am f***ing done watching you die.

Donita:  Please help me.

Elliott:  I'm not helping you, Donita. You're f***in' Satan.  You hate my f***in' guts.

Donita:  No I don't.

Elliott:  You want me to f***in' die.

Donita:  No I don't.

Elliott:  I am not helping you.

Donita:  I love you, Goddammit.

Elliott:  No you don't.

Donita:  Please help me.

Elliott:  Somebody'll be here to help ya.

Conf. Ex., State's Ex. 1.

[12]  At 12:54 a.m., Elliott called 911.  Elliott stated that he had just shot his wife. He told the dispatcher that he "knew it was gonna' come to violence" and that his wife stormed in the door.  Conf. Ex., State's Ex. 2.  He later said, "We knew

it was comin' to this.  The officers knew.  Everybody knew."  *Id.*  Elliott first told the dispatcher that he thought his wife was "okay" and was breathing and snoring; he was not sure where, or even if, his wife had been shot; and he did not see any blood.  *Id.*  However, later in the conversation, Elliott, crying, told the dispatcher that he did not think his wife was breathing.

[13]  As the 911 call continued, the dispatcher asked if Donita had any weapons, and Elliott replied that his wife had a knife and that it was lying next to her body.  The dispatcher attempted to instruct Elliott in rendering medical assistance to Donita, but Elliott indicated that he was unsure how to assist her.  Elliott told the dispatcher that he knew his wife was going to try to kill him because she "said she was gonna[,]" and that "it all happened so fast."  *Id.*  The dispatcher asked Elliott if he could perform chest compressions on Donita.  Elliott answered in the affirmative and told the dispatcher that he was performing the compressions.  Approximately nine minutes into the 911 call, the dispatcher told Elliott to exit the house with his hands up for the benefit of the responding authorities.

[14]  The police and medics arrived at the scene, and Donita was transported to the hospital.  She arrived alive but died later that morning from a gunshot wound to her chest.

[15]  At approximately 5:00 a.m. the morning of the shooting, Elliott was interviewed by the police at the police station.  He was not under arrest at the time.  When first interviewed by the police, he said that Donita came at him

with a knife while he was lying on the couch, and he shot her in self-defense. At a second interview with the police that occurred two days later, on August 10, Elliott again claimed self-defense, but told the detective that he was sitting in the recliner when Donita attacked him with the knife.

[16] A few days later, the police recovered Elliott's cell phone and discovered that it contained an audio recording of the shooting. The recording, along with other evidence found at the scene of the shooting, contradicted Elliott's claim that he shot his wife in self-defense. The police then interviewed Elliott for a third time on August 14. During the interview, the police played for Elliott the audio recording from his cell phone. Elliott was hearing the recording for the first time. After the recording was played for him, Elliott admitted that Donita had not attacked him with a knife but that he had planted a knife after shooting her. Elliott was charged with murder and two counts of false informing as Class A misdemeanors.

[17] During their marriage, Elliott and Donita were members of the Reformed Presbyterian Church of Lafayette. They had joined the church around 2007. Pastor Keith Evans was Elliott's pastor for six years and Donita's for five, and during his tenure at the church, the pastor counseled with the couple "half a dozen to a dozen times." Tr. Vol. 3, p. 83. Sometime after the shooting but before August 14, Elliott sent a letter to the church congregation, explaining that he shot his wife in self-defense because she attempted to kill him with a knife. Elliott asked Pastor Evans to share the letter with local media, and Pastor Evans did so.

[18]     Pastor Evans visited Elliott in jail several times.  Elliott initially told the pastor that Donita had attacked him with a knife and that he needed to defend himself.  However, at a subsequent meeting, Elliott admitted to his pastor that he had lied about shooting his wife in self-defense and that he had planted the knife.

[19]     Prior to the start of his trial, Elliott moved to suppress all statements made to the pastor, arguing that they were inadmissible, privileged communications. The trial court denied Elliott's motion on December 21, 2018.  The suppression issue was certified for interlocutory appeal in February 2019; however, this Court declined to accept jurisdiction over the appeal.  On July 11, 2019, the State dismissed one count of false informing against Elliot.

[20]     A five-day jury trial commenced on July 12, 2019.  At trial, Elliott testified that Donita had attacked him with the knife and that he shot her in self-defense. The State maintained that Elliott was not acting in self-defense and that he had planted the knife to make it appear as though he shot Donita in self-defense. Pastor Evans testified over Elliott's objection that Elliott admitted to him that he had planted the knife at the scene of the shooting.

[21]     At the conclusion of the trial, the jury found Elliott guilty of murder and false informing.  In the second phase of his trial, Elliott waived his right to have the jury consider the firearm enhancement, and he admitted to the enhancement. On September 26, 2019, the trial court sentenced Elliott to sixty years for murder, enhanced by fifteen years because he used a firearm to commit the

offense, and to a concurrent term of one year for false informing, for a total executed sentence of seventy-five years. He now appeals. Additional facts will be provided as necessary.

# Discussion and Decision

## I. Clergymen Privilege

[22] Elliott argues that the trial court improperly permitted Pastor Evans to testify to the incriminating statement that Elliot made to the pastor. Pastor Evans visited Elliott three times while Elliott was in jail awaiting trial. During the second visit, Elliott told the pastor that he planted the knife at the scene of the shooting. According to Elliott, the incriminating statement he made to his pastor was protected by the clergymen's privilege under Indiana Code section 34-46-3-1(3)(A) and (B) (1998), and the State should not have been allowed to introduce the statement from the pastor during Elliott's trial.

[23] The State argues initially that the pastor, "not Elliott, held the clergymen privilege[,]" and "the privilege is [the clergyman's] alone to exercise or waive." Appellee's Br. pp. 14, 15. We reject that argument.

[24] The clergymen privilege is a subsection within the "Privileges of Attorneys, Physicians, Clergymen, and Spouses" statute, codified at Indiana Code section 34-46-3-1, which provides:

> Except as otherwise provided by statute, the following persons shall not be required to testify regarding the following communications:

(1) Attorneys, as to confidential communications made to them in the course of their professional business, and as to advice given in such cases.

(2) Physicians, as to matters communicated to them by patients, in the course of their professional business, or advice given in such cases.

(3) Clergymen, as to the following confessions, admissions, or confidential communications:

> (A) Confessions or admissions made to a clergyman in the course of discipline enjoined by the clergyman's church.

> (B) A confidential communication made to a clergyman in the clergyman's professional character as a spiritual adviser or counselor.

(4) Husband and wife, as to communications made to each other.

[25] In *Glover v. State*, 836 N.E.2d 414 (Ind. 2005), the question before our supreme court was whether, regarding a sham marriage, the trial court could require the wife to testify to confidential communications between her and her husband. The Court held that the "marital privilege prevents a court from *requiring* a spouse to testify as to confidential marital communications, but does not bar the spouse from testifying if the spouse chooses to do so." *Id.* at 422 (emphasis added). However, the Court also discussed the other privileges listed under Section 34-46-3-1 and explained that the professional privileges and the marital

privilege were "qualitatively different" from one another. *Id.* at 420. The Court expounded as follows:

> [T]he statutory language also produces different results for the marital privilege than it does for the other privileges found in the same section. The marital privilege in Indiana provides that a court "shall not [require]" one spouse to testify against the other. I.C. § 34-46-3-1(4). As a matter of ordinary English, this permits a willing spouse to testify. Other privileges (attorney/client, physician/patient, priest/penitent) appear in the same section of the Indiana Code and the same linguistic point applies to them. But in the case of the attorney and the physician, each is bound by a formal obligation of the profession to keep the confidences of the client. . . . *Many clerics are similarly bound.* . . . *These obligations create a right in the client to demand confidentiality*, and the court cannot "require" testimony. There is no corresponding set of ethical and disciplinary rules for the marital relationship.

*Id.* at 421-22 (internal citations omitted) (emphasis added).

[26] Thus, the purpose of the privileges statute is to prevent certain statements by a person, here the defendant, "made to" an attorney, physician, or clergyman from being used in evidence against the defendant. *See* Ind. Code § 34-46-3-1. We place greater value on protecting such statements in such relationships than on their use as evidence. In an opinion issued by the United States Supreme Court, that critiqued an archaic and unduly expansive rule that permitted a defendant to exclude from evidence any adverse spousal testimony but referred favorably to several privileges by analogy, among them the "priest-penitent" privilege, the Court stated:

The privileges between priest and penitent, attorney and client, and physician and patient . . . are rooted in the imperative need for confidence and trust. The priest-penitent privilege recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return.

*Trammel v. United States*, 445 U.S. 40, 51, 100 S. Ct. 906, 913, 63 L. Ed. 2d 186 (1980).

[27] Not all statements are protected, only those that qualify under the statute. If, as the State argues, the privilege to prevent use of a statement belongs only to the clergyman, there is no sure protection for a defendant. The issue here is not whether the pastor is willing to testify, but whether the incriminating statement Elliott made to him is a confession or admission made in the course of discipline under Subsection 34-46-3-1(A), or a confidential communication under Subsection (B), such that the pastor should not have been permitted to testify to the statement over Elliott's objection. We first set forth the standard of review and then address these issues in turn.

### A. Standard of Review

[28] The decision to admit or exclude evidence is within the trial court's sound discretion and that decision is afforded a great deal of deference on appeal. *Bacher v. State*, 686 N.E.2d 791, 793 (Ind. 1997). The decision whether to admit evidence will not be reversed absent a showing of manifest abuse of a trial court's discretion resulting in the denial of a fair trial. *Allen v. State*, 813

N.E.2d 349, 361 (Ind. Ct. App. 2004), *trans. denied.* An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Zawacki v. State*, 753 N.E.2d 100, 102 (Ind. Ct. App. 2001), *trans. denied*. Regarding the clergymen privilege, this privilege must be strictly construed because of its statutory derivation. *Mullins v. State*, 721 N.E.2d 335, 338 (Ind. Ct. App. 1999), *trans. denied*.

### B. Admission Made to Clergyman in Course of Discipline

[29] Elliott first argues that Pastor Evans should not have been allowed to testify to the incriminating statement because the statement was an admission made to his pastor, a clergyman, "in the course of discipline enjoined by" his pastor's church. Ind. Code § 34-46-3-1(3)(A). Elliott maintains that Pastor Evans delivered discipline to him while he was in jail and that the "discipline sought that Elliott own up to his sins and repent." Appellant's Br. p. 21. According to Elliott, "the pastor told [him] that he needed to repent[, and] Elliott repented." *Id.* at 23.

[30] In support of his argument, Elliott directs us to two cases: *Ball v. State*, 275 Ind. 617, 419 N.E.2d 137 (1981) and *Mullins*. In *Ball*, the defendant initiated a conversation with a reverend and admitted to killing three people. Over Ball's objection, the trial court allowed the State to present the evidence from the reverend at trial. The question before our supreme court was whether the reverend engaged in the conversation in the course of discipline enjoined by the church. The Court concluded that the reverend did not, and, therefore, the reverend was competent to testify to Ball's admissions. Specifically, the Court

found that the trial court did not err in allowing the evidence based on the reverend's testimony at trial that the "pastoral confession d[id] not constitute one of the tenets or disciplines of [the] church[;]" the "church d[id] not recognize a confidential pastor-parishioner relationship with respect to evidence of a crime[;]" and "if a person were to talk to [the reverend] about a legal matter, he would tell them that he would not 'stand up' for him and would not keep the information confidential" but, instead, "would testify against someone if he learned from them that they had committed a crime." 275 Ind. at 139-40, 419 N.E.2d at 619.

[31]    In *Mullins*, the defendant stole personal checks from a Catholic priest he knew and then forged and cashed one of the checks. When the priest discovered the crime, he summoned Mullins to the rectory, confronted him about the checks, and "'asked him why he did it.'" 721 N.E.2d at 337. Mullins apologized to the priest and told the priest he would try to repay him, but Mullins failed to do so. At trial, the priest testified to Mullins' apology.

[32]    On appeal, Mullins argued that his apology to the priest was erroneously admitted into evidence because it was a privileged confession under Indiana Code section 34-46-3-1. He noted that the Catholic faith recognizes the sanctity of confession. A panel of this court agreed that "the Catholic sacrament of reconciliation clearly falls within the strictures of the [clergymen privilege] statute as confessions made to a clergyman in the course of discipline enjoined by the clergyman's church." *Id.* at 338. However, we ultimately found that Mullins' communications with the Catholic priest were outside the priest's

course of discipline and were not privileged because the "confession" was no more than an apology to the priest that took place in the priest's kitchen after the priest had summoned Mullins. *Id.*

[33] In *Bonham v. State*, 644 N.E.2d 1223 (Ind. 1994), a case we find instructive, the defendant was accused of killing his acquaintance's mother. A pastor of a church where Bonham's parents were members had visited Bonham in jail. During the visit, Bonham told the pastor how he had killed the victim. Bonham's counsel filed a motion to suppress the evidence on the basis that it was a privileged communication; however, the trial court overruled the motion and allowed the pastor to testify. Bonham appealed and our supreme court noted that the pastor testified that "there was no course of discipline in his church that required a formal confession of sins." 644 N.E.2d at 1225.[4] Thus, the trial court did not err in overruling Bonham's motion to suppress and his counsel's objection to the pastor's testimony. *Id.*

[34] Elliott attempts to distinguish his case from *Ball* and *Mullins*. However, we find his attempts unavailing and conclude that Pastor Evans' testimony was properly admitted. We first note that, prior to trial, Pastor Evans was deposed as part of the evidence obtained for Elliott's motion to suppress the statements

---

[4] We note that when the decisions in *Ball* and *Bonham* were issued, the clergymen privilege was codified under Indiana Code section 34-1-14-5(4) (repealed 1998), which read as follows: "The following persons shall not be competent witnesses: . . . . Fifth. Clergymen, as to confessions or admissions made to them in course of discipline enjoined by their respective churches."

he made to the pastor.[5]  During the deposition, the pastor testified regarding whether his church had a sacrament for the confession of sins:

> Q First question, does your church have like a formal form of penitence where people would come to you and quit[e] literally confess their sins to you?
>
> A No.  I engage in counseling but that is not viewed as penitence and confession in that sense at all.
>
> Q Okay, so there's no like sanctity of a confession within your church, is that correct?
>
> A No, if the Reformed Church would clearly break from the Catholic tradition, it would have such a notation.
>
> Q Okay, second question. . . .  Would you go to law enforcement and let the [p]olice know that this guy came and told me that he buried someone in the back yard?
>
> A Absolutely.  Yeah, I very much see myself as under the authority of the Civil Magistrate and that would be my responsibility, yes.

Appellant's App. Vol. 2, pp. 106-07.

---

[5] Pastor Evans was deposed because, at the time Elliott filed his motion to suppress the statements he made to the pastor, the pastor was living in Pennsylvania and was serving as a professor of counseling at a theological center.

[35]     At trial, Pastor Evans testified that when he met with Elliott at the jail the second time, he delivered to Elliott a letter containing church discipline because the pastor and the church had discovered that Elliott's claim of self-defense had been called into question.  The letter reads:

> September 1, 2017
>
> Dear Pat,
>
> When news first broke about Donita's death, we were understandably grieved and deeply concerned.  As details began to unfold, and we were told by you that Donita was suffering a significant break from reality, had threatened your very life, and attempted to kill you with a kitchen knife, resulting in your need to exercise self-defense; while still deeply grieved, we were tremendously supportive of you.  At the time, we were thankful for the letter you wrote to the Church explaining the circumstances, and we were even willing to forward that letter along to the press, at your request, because we believed it to helpfully clarify the events of August 8.  We also propagated your narrative to the congregation and to those enquiring about your standing in the Church of Christ.
>
> All of this changed when the affidavit of your arrest and charges were released to the press.  In the affidavit, by the testimony of multiple police officers, it has been confirmed that you lied about the self-defense scenario, confessed to planting a knife on your wife, and therefore deceived:  not only your session, but your congregation, and manipulatively used the Lafayette Church to present a false narrative of the events to the public.
>
> Therefore, we as the Session of the RP Church of Lafayette, find you guilty of the great sins of lying to the Church of Jesus Christ

surrounding the death of your wife, and manipulatively deceiving the Church for the sake of propagating your lies. It is in that light that we voted to suspend you from the privileges of church membership at the August 31, 2017 session meeting.

> *Whereas you, Patrick Elliott, have been found guilty of the sins of lying and deceiving the Church of Christ, this Court, in the Name of the Lord Jesus Christ, sadly and solemnly suspends you from the privileges of church membership, including participation in the sacraments, until you have given satisfactory evidence of true repentance, and have been restored to good standing by this Court.*

Pat, you need to know that you are not right with Jesus. While we are presently withholding judgment as to the nature of your killing of Donita, it is imperative that you be confronted sooner rather than later with the fact that you may not deceive yourself. You have lied, and you have deceived us, but the charade is not continuing. Do not be deluded into thinking that you are perfectly fine in the eyes of your Lord. You have sinned grievously and need to repent and demonstrate the fruits fitting for repentance.

We pray that this discipline will be the very thing necessary to awaken your soul to the terrible realities of the path that you are on. We call you, in the name of Jesus Christ, to genuine and deep brokenness over your sins. In this, we await a response from you, a response of softening, a response of complete honesty, and a response of holiness. Until then, we are praying for you, Pat.

The Session of the
Reformed Presbyterian Church of Lafayette

Ex., Def.'s Ex. B, p. 219. The pastor testified that when he delivered the letter to Elliott and explained to Elliott that the church and the church session had determined that "we had been deceived, we had been lied to as a church[, Elliott then] said[,] I did not lie except for the knife, I planted the knife but everything else [regarding] my story is the same." Tr. Vol. 3, pp. 82-83.

[36] Although the discipline letter stated that Elliott's privileges as a member of the church were suspended, that he had "sinned grievously" and needed to repent, and that the church was awaiting a response from him of "softening," "complete honesty," and "holiness[,]" the pastor testified that the Reformed Presbyterian Church does not recognize a formal confession. Ex., Def.'s Ex. B, p. 219. When asked if the church recognizes privileged communications between the pastor and a church member, the pastor explained that the church recognizes "the need for discretion but not confidentiality." Tr. Vol. 3, p. 95. When asked if a member must make a formal confession to the pastor in order to "get right with God[,] Pastor Evans answered, "Not a formal confession[,] no." *Id.*

[37] Based upon the foregoing, and in light of *Ball*, *Mullins*, and *Bonham*, we conclude that Elliott's statement to Pastor Evans was not made "in the course of discipline enjoined by" Pastor Evans' church. *See* Ind. Code § 34-46-3-1(3)(A). Therefore, the trial court did not err in admitting the pastor's testimony.

### C. Confidential Communication Made to a Clergyman

[38] Elliott next argues that the incriminating statement he made to Pastor Evans was protected under Subsection (B) of Indiana Code section 34-46-3-1(3) because the statement was a "confidential communication made to a clergyman in the clergyman's professional character as a spiritual adviser or counselor." Ind. Code § 34-46-3-1(3)(B). We disagree.

[39] At trial, Pastor Evans testified that the first time he met with Elliott at the jail, he did so as his pastor to provide pastoral care. However, when Pastor Evans visited Elliott the second time, the pastor presented Elliott with the discipline letter from the church. The letter stated that Elliott's church privileges had been suspended; he needed to repent; and the church was awaiting a response from him. Elliott then disclosed to the pastor that he had lied to the pastor and the church, in that, he had planted the knife at the scene of the shooting.

[40] We find nothing in this conversation between the pastor and Elliott, and Elliott points us to no evidence, that indicates that Elliott expected any confidentiality on the pastor's part or that Elliott was seeking spiritual advice or counseling from Pastor Evans in the pastor's professional character. *See, e.g.*, *Mullins*, 721 N.E.2d at 338 n.4 ("nothing in the conversation between [the priest] and Mullins indicates that Mullins expected any confidentiality or that he was seeking advice or counseling from [the priest] in his priestly capacity."). Furthermore, Pastor Evans testified that confession was not part of the Reformed Presbyterian Church's discipline; the church recognized the need for discretion but not confidentiality; and if a member of the church reported a

crime to him, he believed it was his responsibility to report the crime to the authorities. Based on the foregoing, we find that the incriminating statement Elliott made to his pastor was not protected under Indiana Code section 34-46-3-1(3)(B). Thus, the trial court did not abuse its discretion when it allowed the pastor to testify over Elliott's objection.

[41] Even if the trial court had erred in admitting the pastor's testimony, the error would not require reversal. Generally, errors in the admission or exclusion of evidence are to be disregarded as harmless unless they affect the substantial rights of a party. *Allen*, 813 N.E.2d at 361. In determining whether an evidentiary ruling affected a party's substantial rights, the court assesses the probable impact of the evidence on the trier of fact. *Id.* Evidence that is merely cumulative is not grounds for reversal. *Tobar v. State*, 740 N.E.2d 106, 108 (Ind. 2000).

[42] Here, additional independent evidence of the planting of the knife was presented during Elliott's trial. For example, when the police interviewed Elliott and played the recording of the shooting for him, Elliott admitted that he had planted a knife after shooting his wife. When Elliott testified in his own defense, he admitted that he told the police that he planted the knife. Even if the trial court had erred in allowing Pastor Evans to testify, any error in the admission of the testimony did not affect Elliott's substantial rights because the evidence was cumulative and therefore was harmless.

# II. Sentence

Elliott contends his seventy-five year aggregate sentence is inappropriate given the nature of the offenses and his character, and he asks us to reduce his sentence. Indiana Appellate Rule 7(B) provides that we may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we determine that the sentence is inappropriate in light of the nature of the offense and the character of the offender. *Thompson v. State*, 5 N.E.3d 383, 391 (Ind. Ct. App. 2014). However, "we must and should exercise deference to a trial court's sentencing decision, both because Rule 7(B) requires us to give 'due consideration' to that decision and because we understand and recognize the unique perspective a trial court brings to its sentencing decisions." *Stewart v. State*, 866 N.E.2d 858, 866 (Ind. Ct. App. 2007). Such deference to the trial court's judgment should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character). *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). Thus, the question under Appellate Rule 7(B) is not whether another sentence is *more* appropriate; rather, the question is whether the sentence imposed is inappropriate. *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008). The defendant bears the burden of persuading the appellate court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[44]     To assess whether a sentence is inappropriate, we look first to the statutory range established for the class of the offense.  Here, Elliott was convicted of murder, a felony, and false informing as a Class A misdemeanor.  For a murder conviction, the maximum sentence is sixty-five years, and the minimum sentence is forty-five years, with an advisory sentence of fifty-five years.  Ind. Code § 35-50-2-3(a) (2015).  The trial court sentenced Elliott to sixty years for murder, which is five years more than the advisory sentence but five years less than the maximum sentence.  As an enhancement for a firearm used in the commission of murder, the trial court may impose an additional term of between five and twenty years.  Ind. Code § 35-50-2-11(g) (2016).  The trial court enhanced Elliott's sixty-year sentence by fifteen years.  A person who commits a Class A misdemeanor shall be imprisoned for a fixed term of not more than one year.  Ind. Code § section 35-50-3-2 (1977).  The trial court sentenced Elliott to the maximum of one year for the false informing and ordered the one-year sentence to run consecutive to the murder sentence.  In sum, the trial court imposed an aggregate sentence of seventy-five years, which was eleven years less than the maximum aggregate term of eighty-six years the court could have imposed.

[45]     As to the nature of the offenses, we first note that Elliott committed callous, heinous, and calculated acts.  In cold blood, he shot and killed his wife from a distance of between six and thirty inches for no apparent reason—other than to be rid of his wife because of his wife's battle with mental illness and its impact on him.  On the night in question, Donita left home for a few hours and

checked into a motel, after becoming upset by a wellness check that Elliott had requested from the TCSD. While she was away, Elliott retrieved a handgun from his car, brought it into the house, and hid it in the buffet. When Donita returned to the home to pick up a few belongings, Elliott began to argue with her about her medication and the sleeping arrangements for that night. The two appeared to fight over a chair in the living room, and Elliott pulled out the gun. Donita told Elliott, "It's my chair. Get the f*** out." Conf. Ex., State's Ex. 1. She then stated, "Shoot me. I don't care, give . . . I don't give a f***. Shoot me." *Id.* Elliott said nothing in reply and, instead, fired the gun immediately, striking his wife in the chest. Though his wife was still alive and begged Elliott eight times to help her, Elliott waited two minutes before calling 911. He told her, "I will help when I am f***ing done watching you die." *Id.* When Elliott called 911, and the dispatcher attempted to instruct him in rendering medical assistance to Donita, Elliott first indicated that he was unsure how to assist her. Elliott did not administer aid to his wife until several minutes later—eight minutes into the call—when the dispatcher asked Elliott if he could perform chest compressions on his wife, and Elliott indicated to the dispatcher that he would do so. Donita died later that morning at the hospital. As for the false informing offense, Elliott planted a knife at the scene of the shooting and then lied to the police, telling them his wife attacked him with the knife and that he shot her in self-defense. We find nothing regarding the nature of Elliott's offenses that persuades us his sentence is inappropriate.

[46] Regarding his character, Elliott, in an effort to portray his character in a positive light, argues that he has a "very minimal" criminal history; he had a work history; and he had the support of his family. Appellant's Br. p. 28. We review an offender's character by engaging in a broad consideration of his qualities. *Aslinger v. State*, 2 N.E.3d 84, 95 (Ind. Ct. App. 2014), *clarified on other grounds on reh'g*, 11 N.E.3d 571. "When considering the character of the offender, one relevant fact is the defendant's criminal history." *Garcia v. State*, 47 N.E.3d 1249, 1251 (Ind. Ct. App. 2015), *trans. denied* (2016). Elliott was convicted of public intoxication in 1994, operating a vehicle with a blood alcohol concentration of .10% or more in 1997, and false informing in 1997. He was charged with Class D felony criminal confinement and battery resulting in bodily injury in 1991, and three petitions to revoke his probation have been filed against him. At sentencing, the trial court acknowledged that Elliott's criminal history was "mitigated by the distance in time between the last conviction and the commission of this offense," however, this did not diminish the fact that Elliott has a criminal history. Tr. Vol. 5, p. 111; *see, e.g.*, *Reis v. State*, 88 N.E.3d 1099, 1105 (Ind. Ct. App. 2017) ("Even a minor criminal record reflects poorly on a defendant's character[.]"). The trial court also considered as mitigating factors Elliott's work history and that he had the support of his family.

[47] At the sentencing hearing, the trial court also expressed the following regarding Elliott's trial:

"I'll help you when you're dead."  That's not the only thing I remember about [your] trial, but that's the, that is your statement, which frankly, I believe sealed your fate.  And that's what people who knew you will remember, the playing of that audio tape after 8 or 9 requests for help, that "I'll help you when you're dead."

Tr. Vol. 5, p. 110.  Elliott retrieved a handgun, waited for his wife to return to their home, argued with her, and then shot her in the chest at close range for no apparent reason.  He ignored his wife's repeated pleas for help, telling her, "[n]ope" and, cruelly, that he would help her when he was finished watching her die.  Conf. Ex., State's Ex. 1.  To make matters worse, he waited two minutes after shooting her to call 911, and he was reluctant to administer CPR.  He lied to the 911 dispatcher, the police, his pastor, and his church about the events of the shooting—telling everyone that his wife attacked him with a knife when, instead, he planted a knife at the scene.  At sentencing, the trial court noted the following regarding remorse:  "[F]rom your statements, from the actions of that evening, morning again, . . . I don't see any remorse for that which occurred."  Tr. Vol. 5, p. 112.  Thus, we find that Elliott's character does not render his sentence inappropriate.

[48]     Based on the nature of the offenses and his character, Elliott has failed to persuade this Court that his seventy-five year sentence, which includes a sixty-year sentence for murder, a fifteen-year enhancement because he used a firearm in the commission of the offense, and a concurrent one-year term for the false informing offense, is inappropriate.  We affirm Elliott's aggregate sentence.

# Conclusion

[49] For the reasons stated, we conclude that the trial court did not err in admitting Pastor Evans' testimony regarding Elliott's admission that he planted the knife at the scene of the shooting and that Elliott's seventy-five year aggregate sentence was not inappropriate in light of the nature of the offenses and his character.

[50] Affirmed.

Bailey, J., and Mathias, J., concur.